Case number 18-7160, William Loveland College, balance, v. Distance Education Accreditation Commission Mr. Aurelio for the balance, Mr. Ruby for the ability Good morning, your honors. May it please the court, my name is attorney Scott Aurelio. I'm from the law firm of Weston Heard and I represent William Loveland College, the appellant in this matter. I've requested four minutes for rebuttal. Your honors, this matter is on appeal from a decision of the district court disposing of the complaint of William Loveland College under 12b6 for failure to state a claim. Specifically, the district court ruled, amongst other things, that prior to seeking relief in the district court. William Loveland College is an online college which offers an MBA in logistical management. William Loveland College has a long history. It originally began in 1923 as a college of advanced traffic and academy of advanced traffic school. In 2001, it first became nationally accredited. In 2017, a series of events occurred leading to the matter that's before the court today. Specifically, the fact which underlies all of the claims is the issuance of a public show cause by the Distance Education Accrediting Commission. Specifically, the DEAC issued a public show cause order on its website identifying certain alleged deficiencies with the school's accrediting. Amongst the various problems with the DEAC's public show cause notice was the date of the show cause notice. Specifically, the show cause was issued in February of 2017. The DEAC, amongst getting many, many other things incorrect in the show cause notice, got the actual date of the show cause notice incorrect. They predated it by approximately one year. The issuance of the show cause directive, of course, triggered various problems with our donors, with our students. Can I just ask a question about the arguments that we have before us? Sure. So the district court resolved the claims, at least put aside the state law claims for a second. Sure. Resolved the meat of what you've raised on exhaustion grounds. Yes, sir. On the ground that there was a failure to pursue administrative exhaustion and that on the assumption that that rubric, even though we're not dealing with a government actor, that that rubric applies here. That's correct. As I understand your argument, you don't, the argument you presented to us in your brief, you don't take issue with the applicability of the exhaustion framework. You don't take issue with the legal principles. At least I didn't see any argument to that effect in your brief. What you're taking issue with is the conclusion that it wouldn't have been futile to go through exhaustion. We take issue with the futility. Yes, we allege that exhausting would have been futile, as well as the adequacy of the procedures that were laid out in the DEAC's accreditation handbook. And that's why we believe that the district court erred. For those two reasons, and if I may address the first, the issue has arisen as to whether or not this show cause notice is actually a final order or a final adjudication. Under 34 CFR 602.26, final orders must be published. And the DEAC, as well as the district court, maintain that because a show cause is equivalent to probation, it is essentially a final order and the DEAC is own administrative policies specified that a show cause order is not actually a final order. That it's not an adverse decision, it's rather a statement of concern. So we have within these administrative policies inconsistencies and certainly inconsistencies with the regulations. And this is where we think a major problem lies in that under 34 CFR 602.25F, prior to the issuance of any final decision, we have to be given, the college has to be given the opportunity to appeal, to correct the record, to let's get this right before it's published to the general public. We were never given that opportunity. If the court is going to presume that the show cause order is a final order or is a final determination which requires publication, we have to have the opportunity to appeal before that becomes public. And the damage and the danger that results is very evident in this case, which is one of the reasons why the case should be reversed and remanded, is because as soon as this show cause directive was issued and put on the DEA's website, the die was cast. How can a show cause order be a final action, since it specifically, even the name of the directive itself is a statement of determination. It's a statement to the general public. What the trial court calls it is it's akin to probation, which under the regulations is a final act. And in fact, the DEAC in its briefing, beginning I believe page 23, does in fact argue that the show cause directive is a final order. So, but once that show cause directive is issued, the die is cast. The public is put on notice of all these various accrediting deficiencies, whether right or wrong, and then we're supposed to sort of unring that bell, if you will. Now, whether the die is not cast with respect to accreditation, the whole point of the show cause order is that there's still an opportunity. We don't yet know whether there's going to be accreditation at the time of the show cause order. So you're not talking about that die being cast. No, I would agree with you, Your Honor, that the accreditation had not been terminated at that point. However, for all practical purposes, it had been. Amongst other things, the error in the show cause order predating it by one year, when this public show cause was made known, we got calls from our donors. We got calls from our students. We were accused of fraud. We had over $17 million in donations lined up to fund the future expansion of this college. Those donations were withdrawn. We were accused of not disclosing to our donors and to our students the fact that we had been on probation or under show cause for one year. Right. I mean, I guess I'm not suggesting that the issuance of a show cause order can't have practical effects, because when something is published about anybody or anything, it can have practical effects. But in terms of what we're looking at, there was process yet to be had after the issuance of a show cause order that you chose not to, that your client chose not to avail itself of. I would agree with that to some extent. First of all, that's where I believe we get into the futility argument, which is, amongst other things, Executive Director Matthews recusing herself and appointing a law firm to undertake the remainder of the accreditation process, the continuing review of the accreditation. But to circle back, for purposes of due process, under 602.25, the DEAC, the agency, must demonstrate that it afforded us ample due process by, amongst other things, giving us the right to appeal before a decision becomes final. And if we accept the trial court's decision that a show cause is final, if we accept the DEAC's position that the show cause is final, we should have been given that opportunity to appeal. And as you've indicated, there are practical ramifications. Those practical ramifications, even though we still are accredited, we're an institution now being accused of defrauding our donors and our students. I mean, that is, in fact, a denial of our due process. And that's why we stand here aggrieved, is that we needed the opportunity to come into court. We were not given this opportunity prior to publicizing to the world this series of events leading us to be accused of fraud. And the post-show cause remedies were not adequate, given the fact that, number one, Leah Matthews had already recused herself as the executive director. And number two, inclusive within the body of that show cause directive was a statement that, reapply. You haven't lost your accreditation, but start over. Reapply as a new institution. The application... accrediting institutions to mean that when a show cause order is issued, it's the equivalent of putting an organization at school on probation. And that's in their guidance. Do you disagree with that interpretation? And if so, where can I find the reasoning in your brief? Or do you just accept it? Well, I think we're caught in sort of a no-man's land where the... I agree with you. That's what the Department of Education's guidelines do specify. However, the DEAC says, well, we're not going to abide by that, essentially, and we're going to call our show cause just notice of an adverse or concern. It's not an adverse action. It's just notice of concerns. So, in our briefing, where do we... in our briefing and in our underlying complaint, the issue was raised that we had inadequate procedures prior to the issuance of the public notice, if that answers your question. Well, I'm wondering what the reasoning is for... if you disagree. I didn't find in your brief a section that takes the Department of Education to task for its interpretation. If I understand you now, there isn't. But you haven't made that argument. I believe we have made that argument, Your Honor. Okay. When you get up for rebuttal, will you give me the pages on which I can find it? Absolutely. Okay. Thank you. Thank you, counsel. Thank you. Mr. Ruby. Good morning, Your Honors. And may it please the Court, Josh Ruby on behalf of the Distance Education and Training Council doing business as the Distance Education Accrediting Commission. Your Honors, just simply put, to refocus, what this case is about are rules. The rules that Congress and the Department of Education set for what institutions like the college are supposed to do when they get a result during the accrediting process that they don't like. Those are rules that are designed to ensure the college gets the due process it's entitled to and that the decisions of the accrediting commissions, like the DEAC, are fair and consistent. Those are rules the college agreed to follow each and every time it submitted an application for accreditation or for renewal of its accreditation. And those are rules the college broke when the Show Cause Directive, notice of which was put on the commission's website, when the college, instead of following all the procedures that it still had in front of it, consideration of a new application, appeal of any adverse decision to an appeals panel, review by an independent arbitrator, the college skipped all those steps and went straight to this court with a lawsuit seeking, or excuse me, to the District Court for the Southern District of New York with a lawsuit seeking $17 million in damages. The District Court, applying a variety of legal theories, concluded that that was improper and dismissed the lawsuit with prejudice. And the commission respectfully submits that this court should affirm. I want to start with the exhaustion issue. And without taking issue with everything that my brother counsel said during his argument, one thing that he did not address is this court's standard for futility, the argument for futility exception to the exhaustion of administrative remedies doctrine. I point your honors to the communications workers case, which says that in order to make out a case for exhaustion, the party that's claiming that exhaustion should be excused for futility has to show that each of the remaining steps would certainly have resulted in an adverse decision. Certainly have resulted in an adverse decision. And quite frankly, there's nothing in the complaint, nothing in the record where the argument is made that each of these steps that still lay ahead of the college, which again, consideration of a brand new application, not application as a new institution, mind you, because the college's accreditation would have remained in place, that's expressly stated in the show cause directive. But application, a new application for renewal of its accreditation, then if that application was unsuccessful, there would have been the opportunity to appeal to an independent appeals panel, the members of which cannot be the members of the commission. As I understand their argument, though, everything you say is right about accreditation, but it doesn't sound like they're even disputing that. What they're saying is, yeah, maybe accreditation would have been renewed or whatever the proper terminology is in this instance when you already are accredited. But there's nothing that you can do about the show cause order. And respectfully, Your Honor, that's inaccurate. What you can do is you can submit the invited new application. The show cause directive says we've, in effect, we've identified the necessary. But what does that do for you if you submit the – I'm not necessarily taking issue with your ultimate legal proposition. I'm just talking about on this aspect of the case. What does that do for you if you can resubmit? That allows you to remain accredited. Your remaining – I mean, what happened here is that the college remained accredited even though it never submitted that application. It remained accredited until the prior incarnation of its accreditation. But whatever process you just referred to, does that result in something like vacator of the show cause order or expungement of it or something like that? I assume not. Well, if the application were successful, then it certainly would. The show cause status would have been terminated. You can read the directive in the handbook for the process that it sets forth. But what it says in the show cause directive – and I will just very quickly address the date issue. If you look carefully at the – I believe it's on page 65 of the appendix – the screen capture of the commission's website, it talks about the meeting of the commission taking place in January, although the letter is stated in February. And it is – there is an error in the year. That's just a typographical error. But what the – if you look at the show cause directive, what it says is that the college has one year from the January 2017 meeting to come into compliance with the accreditation standards. And so that – and even that period can be extended for good cause. So the college has some amount of time to submit an application. And then built into the process is a very long tail to consider the application, work through whatever the issues are that have been identified in the show cause directive, which are laid out in great detail. When you say to consider the application, that's the application for? Renewal of the accreditation. Renewal of the accreditation. A renewed application for renewal of the accreditation. Yes, and so that – let's just – again, I'm not suggesting that this necessarily ultimately is a problem for you. But just in terms of the argument that's being made, as I understand what they're saying, they're saying, look, okay, we can get accreditation renewed. I get that. That may well be the case that there was process to be had on that score, and maybe we would have prevailed on that. But what really hurt us was the issuance of the show cause order, period. And you just can't unring that bell once the show cause order was issued. And be that as it may, Your Honor, then the issue is with the Department of Education that issued the regulations that say that that has to be published. And I point back to the argument we made in the brief. Which is a different argument, that it has to be published. And notice of it has to be published. Yes. And I think if you – I'll just also point back, if you look at the screen grab, it's evident from that screen grab, the letter itself wasn't published on the website. All that was published was notice. There's a click here notation, but all that says is you can look for the accreditation standards there. That's not the letter. That's something different. And that's plain from looking at the, again, the document that's on the record at page 65 of the appendix. But the point about whether this notice needed to be published at all, again, the party with whom – who is empowered to address that is the Department of Education. If you look at 34 CFR 602.26B1 and B2, what the college's argument is, is that nothing in B1, which speaks in terms of probation, and which as Judge Randolph pointed out, the Department of Education's guidance, says that show cause is a form of probation or should be read within that phrase. The college's argument is nothing within B1 meets that standard unless it also meets B2, which speaks in terms of final decisions on applications for accreditation to withdraw, terminate, et cetera. So under the college's interpretation, B1 might as well not exist because nothing can ever fit into the category of B1 because it's not final. That's simply impermissible. This court's – one of the fundamental canons of statutory construction or regulatory construction, for that matter, or construction of a contract, any legal document, is that every word must be given effect. And that's where the commission respectfully submits that that's so here. And so there must be something that fits into the category in 602.26B1, and that is precisely what happened here. So with the court's leave, I'll proceed on here to just very quickly to the argument on rightness, which the district court also concluded was a basis for dismissing this claim. Because, again, what happened here is that the institution was placed on show cause status, but given the opportunity to submit a renewed application, which was never submitted. And so everything that the college argues, argued below and argues in this appeal, is inherently speculation about contingent future events that might never happen. That's a classic – the classic description under this court's authority and Supreme Court authority of a case that's unripe for consideration, and the district court relying on that basis as an alternative also dismissed on that basis. This court can also affirm on that basis. I want to briefly just talk about the state law claims as well. We submit that the district court's analysis of the defamation issue and the proximate causation issue was correct. Unless there are further questions on those points, I'll rely on our brief and the district court's opinion on those points. And then just finally get to the issue of preemption, where what we have here is a comprehensive federal regulatory scheme set out by Congress and the Department of Education that has very specific standards for what accrediting institutions like the commission must do. And so to plead state law claims, in particular, for example, this defamation claim, that seeks to recover $17 million in damages for a publication required by the regulations. And the breach of contract claim, which in the reply brief the college says that the basis for that claim is a breach of the implied covenant of good faith and fair dealing. In other words, it doesn't rely on any specific provision of the handbook or any other document, but the implied covenant. In other words, common law duties not stated in the regulations, not stated in the handbook, in some way apply to the commission's conduct. Our submission is that under the Armstrong case, that is necessarily applying standards to the commission's conduct, not set by Congress and the Department of Education. That's contrary to the regulatory scheme, inconsistent with it, and therefore an alternative basis for affirming the result below is preemption. Unless there are any other questions, I rest on the brief. Thank you, Counselor. Mr. O'Reilly, we'll give you two minutes. Thank you. And Judge Randolph, in response to your question, I think there are a couple different points in our briefing where we address the issue I was raising. Of our primary brief, pages 12 through 13, and then in the reply brief, I believe under the analysis addressing Dr. David Lady's consideration of Dr. David Lady's affidavit, the issue is raised as to stating at no time did the defendants offer discussion. 12 through 13? Go ahead. I think you were going to say this. I thought you were going to say it was on page 19 to 20 of your topside brief. The only problem with that is it doesn't mention the Department of Education's interpretation, and it does not argue that the Department of Education was incorrect in interpreting its own regulation. That was my question. And if you would restate your question, I'm not sure I followed it. I apologize. The Department of Education promulgates a regulation that says final decision, probation or its equivalent or whatever it is, and then issues a guidance document saying that by that we mean you have to publish a show cause order. If the show cause order, I'm paraphrasing, spells out serious deficiencies, right? So my question to you was did you argue that the Department of Education misinterpreted its own regulation? And if so, what was the argument? I don't find it. Yeah, I don't believe that at any point did we take exception with the Department of Regulations or the Department of Education's interpretation of its regulations. I believe our position is that in advance of that show cause order, you know, interpreting it as a final order, under the regs, we have to be given an appellate process. Okay. Got it. Yes, sir. And that's, I think, one of the main points of our argument is that before the show cause order becomes public, we have to be given the due process of correcting it and correcting things that are very simple, like a date, a date which invoked our donors and our students accusing us of fraud. And if we were given that due process, we believe that the date would have been corrected, various items, our relocation from New Jersey to Colorado. That was approved. All of the items listed in the show cause order were, in fact, approved over a series of approximately six years. They would have all been addressed if we could have had that due process prior to the publication, and that's the college's position. Thank you. Thank you, counsel. Thank you, counsel. The case is submitted.
judges: Srinivasan, Rao, Randolph